UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CASSANDRE CADET, Plaintiff, | : | |
| - against - | : | 22-CV-7406 (VSB) |
| MACY'S, INC., Defendant. | : | **<u>OPINION & ORDER</u>** |

<u>Appearances</u>:

Joshua Matthew Friedman
Joseph Myers
Phillips & Associates, PLLC
Garden City, NY
*Counsel for Plaintiff*

Don M. Tellock
Jaamal Lamont Braithwaite
LeMar Moore
DMT & Associates PLLC
New York, NY
*Counsel for Defendant*

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiff Cassandre Cadet ("Cadet" or "Plaintiff") brings claims against Macy's, Inc. ("Macy's" or "Defendant") for discrimination and retaliation pursuant to 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290, *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, *et seq*. Before me is Defendant's motion for summary judgment. For the reasons that follow, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I. **Factual Background and Procedural History**[1]

Cadet is "a Black female of Haitian national origin." (Doc. 1 ("Compl.") ¶ 5.) From May 5, 2019 to June 2022, Cadet worked "as a Sales Associate in Men's Fragrances in the Macy's store in Herald Square" in New York City. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)[2]

In November 2019, one of Cadet's coworker Olympia Adler lodged an internal complaint alleging that Cadet hit her. (Pl. 56.1 ¶ 10[3].) In the version of Adler's statement given to business manager Karren McMichaels and counter manager Leah Lewis, and written down by McMichaels, Adler alleges that Cadet "had an evil look in her eye and forcefully bumped me with her shoulder." (Doc. 46-9; *see also* Doc. 38-9 at 36.[4]) Adler further stated to her managers that Cadet "is an evil person, an animal, and bully" and that "every-one hates [her.]" (Doc. 46-9; *see also* Doc. 38-9 at 37.) Cadet denied touching Adler. (*See* Doc. 38-9 at 33.[5]) In January

---

[1] Unless otherwise indicated, the facts set forth in this section are undisputed.

[2] "Def. 56.1" refers to Defendant's Rule 56.1 Statement. (Doc. 27.) "Pl. 56.1" refers to Plaintiff's Rule 56.1 Counterstatement. (Doc. 48.)

[3] At various points in Plaintiff's 56.1 statement, Plaintiff claims to dispute a fact but does not cite to evidence giving rise to a factual dispute. Instead, Plaintiff cites to evidence that adds additional context to understand the fact at issue. (*See, e.g.*, Pl. 56.1 ¶¶ 10, 39, 46, 56, 63.) For instance, Plaintiff claims to dispute paragraph 10, which alleges that Adler had an issue with Cadet and lodged an internal complaint against her in November 2019 after Cadet hit her. To dispute this, Plaintiff cites to a portion of her deposition testimony where she states that Adler had issues with Black people generally. (*See* Doc. 46-1 ("Pl. Dep. Tr.") at 233-36.) This context does not render the underlying fact false, and thus I will consider this fact, and any others wherein Plaintiff simply adds additional context, undisputed. *See DeAngelo v. MAXIMUS/NY Medicaid Choice*, No. 19-CV-7957, 2022 WL 3043665, at *1 n.3 (S.D.N.Y. Aug. 2, 2022) (explaining that where Plaintiff purports to dispute a fact but in reality "wants to provide additional facts or context," the court will "regard Defendant's statement as undisputed and consider Plaintiff's additional information if relevant").

[4] Doc. 38-9 at 36–39, submitted by Defendant as an exhibit to its motion for summary judgment, and Doc. 46-9, submitted by Plaintiff as an exhibit to her opposition, refer to the same four-page November 18, 2019 report by Karren McMichaels memorializing Olympia Adler's statement about her altercation with Cadet. Neither party included any facts about this report or its content in their 56.1 statements; however, they both submitted this report as an exhibit, so I take its authenticity to be undisputed and consider it in the context of this motion. *See Deso v. CSX Transp., Inc.*, 790 F. Supp. 2d 1, 6 n.10 (N.D.N.Y. 2011) ("The Court will consider the report in the context of the motion as both parties provided the report as an exhibit and have not objected to its authenticity.").

[5] Doc. 38-9 at 33, submitted by Defendant as an exhibit to its motion for summary judgment, indicates that Cadet gave a statement about the Adler altercation on November 19, 2019, in which she said "I never touched Olympia." Plaintiff's deposition transcript states the same. (*See* Pl. Dep. Tr. 91.) Neither party addresses this in their 56.1 statement, but I consider the fact that Plaintiff claims she never hit Adler undisputed based on the parties' exhibits.

2020, Cadet lodged an internal complaint alleging that Adler racially discriminated against her. (Pl. 56.1 ¶ 11.) Cadet also sought a transfer to another area in the Beauty Department. (*Id.*)

Plaintiff alleges that Adler made disparaging comments regarding black people, such as "Black people are lazy, do not belong, and complain a lot." (*Id.* ¶ 15.) Defendant argues that these allegations were first raised in Plaintiff's deposition, and that she does not allege that she reported these comments at the time to anyone at Macy's. (Doc. 49 ("Reply") 1–2.) At one point in Plaintiff's deposition, she says that she did not contemporaneously report these comments, but later on she said that she did report them to her immediate manager. (*Compare* Pl. Dep. Tr. 235:12-236:7, *with id.* at 248:4-249:18.)

Macy's conducted an internal investigation into the issues between Adler and Cadet. At least until the conclusion of the investigation, Adler and Cadet were separated while at work. (Pl. 56.1 ¶ 12.) The investigator, Karen Bahl, decided the issue between Adler and Cadet was a personality conflict. (*Id.* ¶ 12.) Cadet was not transferred to a different department or position. Although Plaintiff asserts that she was "denied a transfer to the Makeup department on account of the situation with Olympia Adler," (*id.* ¶ 12), Defendant claims in response that "[d]ue to reductions in the beauty area, it was hard to find open slots," and Cadet simply was not chosen after the one interview that she had, (*id.* ¶ 12).

When the COVID-19 pandemic first hit the United States in March 2020, Macy's furloughed many of its store employees, including Cadet and Adler. (*Id.* ¶ 2.) Cadet returned from furlough in August 2020, at which time Anthony Mazzamuto ("Mazzamuto") became her supervisor. (*Id.* ¶ 3.) Adler did not return to Macy's from her furlough. (*Id.* ¶ 14.)

Cadet also worked with Oswaldo Imbachi in the Beauty Department. (*Id.* ¶ 21.) While prior to the COVID-19 furlough Imbachi was a "counter manager" with the ability to direct

employees on what tasks to complete at any given time, the parties dispute whether Imbachi was a counter manager or merely an hourly employee after the furlough. (*Id*. ¶¶ 22–23.) Imbachi had a history of inappropriate workplace conduct, and had received multiple warnings, including a "Final Warning" on June 12, 2014, a "Last Chance – Final Warning" on March 23, 2015, as well as a "Performance/Conduct Warning" in December 2020. (*Id*. ¶¶ 24, 38, 39 (citing Docs. 38-6 ("March 2015 Last Chance – Final Warning"); 38-7 at 7–9 ("December 2020 Performance/Conduct Warning"); Doc. 46-4 ("June 2014 Final Warning")).) Imbachi's March 2015 warning gives examples of his inappropriate conduct, including "rude, argumentative, and inappropriate [conduct] with co-workers" and "derogatory comments referencing Columbians and Dominicans." (*See* Doc. 38-6.)

With regard to Imbachi's conduct related to Plaintiff, Cadet alleges that Imbachi intervened in an interaction between Cadet and a customer and told the customer, "she don't know any better, she's Haitian." (*Id*. ¶ 28.) In front of Cadet on a different occasion, Imbachi threatened another black employee by saying if she did not take a certain retirement package, he would "hang her from a tree and beat her." (*Id.*) Imbachi later repeated the comment to Cadet, asking "are you going to hang me from a tree and beat me?" (*Id.*) During a conversation with Cadet and a co-worker, Imbachi hit the co-worker's leg and when she pushed back against him, Imbachi said "oh, you gave me breast cancer." (*Id.*) Cadet was offended by this comment as her mother and grandmother had breast cancer. (*Id.*) Both parties agree that Plaintiff reported all of the above-mentioned incidents with Imbachi to her supervisor, Mazzamuto, on March 2, 2021. (*Id.* ¶¶ 25–28.) Cadet further alleges that Imbachi told multiple of their coworkers that Cadet was "not Black, [she was] Haitian," although the parties do not agree on whether this was reported. (*Id.* ¶ 29.)

Mazzamuto shared Cadet's allegations with Bernadette Moeller, a Colleague Advisory Specialist responsible for investigating and addressing employee conduct concerns, who opened an investigation into Imbachi. (*Id.* ¶ 26; *see also* Doc. 38 ¶ 2.) Moeller interviewed Imbachi, who admitted to making the breast cancer comment and "the Haitian comment." (Pl. 56.1 ¶ 36.) As a result of the investigation, Macy's terminated Imbachi's employment on March 18, 2021. (*Id.* ¶ 39.) After Imbachi's employment was terminated, Cadet worked three shifts and then took a leave of absence, returning to work on October 28, 2021. (*Id.* ¶ 40.)

Cadet also had a fraught relationship with her supervisor, Mazzamuto. Cadet initially lodged a grievance against Mazzamuto for being rude to her about three weeks after they began working together in 2020. (*Id.* ¶¶ 17–18.) Afterwards, Mazzamuto told Cadet to stay by her counter when he saw her socializing. (*Id.* ¶¶ 19–20.) Cadet alleges that Mazzamuto did this in retaliation for her filing a grievance against him, and that he specifically mentioned the grievance when he told her to stay at her counter. (*Id.* ¶ 19.) Plaintiff also alleges that Mazzamuto informed her coworkers that someone on staff had tested positive for COVID-19, advising them to get tested. (*Id.* ¶ 52.) Plaintiff claims that Mazzamuto did not tell her about the possible COVID-19 exposure. (*Id.*)

Cadet alleges that after she reported Imbachi and he was fired, coworkers stopped referring customers to her. (*Id.* ¶ 48.) Cadet also felt that on numerous occasions, her coworkers were switching from English to Spanish to talk negatively about her and call her names. (*Id.* ¶¶ 47, 51.) After Plaintiff returned from leave, she told Mazzamuto that she did not feel comfortable at work, but the parties dispute whether she provided names of the individuals who were harassing her at that time. (*Id.* ¶ 42.)

Another issue involved Plaintiff wearing a sweater bearing the phrase "Black Girl Magic" to work. (*Id.* ¶ 54.) Mazzamuto told Plaintiff to change, stating that her sweater violated Macy's dress code for the Beauty Department, which requires a "more sophisticated, and elevated look." (Def. 56.1 ¶ 56.) Cadet alleges that her colleagues regularly wore shirts with graphics and were not told they were violating the dress code. (Pl. 56.1 ¶ 56.)

Plaintiff sought a transfer to the women's fragrance department, but Mazzamuto refused to recommend her for a transfer. (*Id.* ¶ 57.) Mazzamuto said this was because Cadet's performance was lacking, while Cadet said that Mazzamuto told her there were no open positions, even though several new employees were later hired into the women's fragrance department. (*Id.* ¶ 57.) Plaintiff additionally alleges that she had utilized paid time off that Mazzamuto failed to input into the Macy's system upon her request. (*Id.* ¶ 60.) Mazzamuto denied getting Plaintiff's requests, which she communicated by text, but he eventually input her paid time off hours. (*Id.* ¶ 60.)

Around Spring 2022, Cadet retained an attorney, who sent Macy's a letter regarding the alleged discrimination she had faced at work. (*Id.* ¶ 45.) In April 2022, Nikkita Washington, a Senior Investigator on the Colleague Advisory Team at Macy's, spoke to Cadet in response to this letter and began an investigation into the incidents Cadet reported. (*Id.* ¶ 46; *see also* Doc. 40 ¶ 2.) Washington spoke to witnesses of the relevant incidents, and the parties dispute whether those witnesses corroborated Cadet's claims. (Pl. 56.1 ¶¶ 46, 47, 61.) Cadet alleges that a witness told Washington that Cadet was called "black girl" in Spanish by coworkers, and a different witness stated that colleagues would give Cadet the cold shoulder because they blamed her for Imbachi's termination. (*Id.* ¶ 61.) Although Washington did not believe that any of the complaints by Cadet had merit, Cadet cites to investigation notes from May 2022, produced by

Defendant, corroborating that coworkers did make the aforementioned statements during the investigation. (*See id.* (citing Doc. 46-14 at 11–12, 16–21).)

Cadet submitted her letter of resignation to Macy's on May 24, 2022, after which, her final day of work at Macy's was June 3, 2022. (Pl. 56.1 ¶ 7.) Cadet resigned while Washington's internal investigation was ongoing, but Washington wrapped up her investigation before Cadet's final day at Macy's, at which point Macy's offered Cadet some options to transfer to other roles within the store. (*Id.* ¶¶ 62, 63.) Cadet followed through with her resignation. (*Id.* ¶ 63.) Cadet began her new job at Brooklyn Methodist Hospital on June 6, 2022. (*Id.* ¶ 8.)

On August 30, 2022, Cadet filed a Complaint against Macy's. (Compl.) On October 5, 2022, Defendant answered Plaintiff's Complaint. (Doc. 9.) After the parties exchanged discovery, Defendant moved for summary judgment on all claims on May 16, 2023. (Docs. 34, 35 ("Mem.").) Plaintiff filed an opposition, (Doc. 47 ("Opp'n")), and Defendant filed a reply, (Doc. 49 ("Reply")).

## II. <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the

nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). "'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." *I.M. v. United States*, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997)).

Courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137

(2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## III. Discussion

Cadet brings discrimination and retaliation claims under Section 1981, the NYSHRL, and the NYCHRL. In her motion papers, Cadet clarifies that she "brings her causes of action, both discrimination and retaliation, solely under a hostile work environment theory." (Opp'n 1.) Accordingly, I analyze Plaintiff's claims alleging a discriminatory hostile work environment on the basis of race and national origin, before turning to her claims alleging a retaliatory workplace environment.

### A. *Hostile Work Environment*

#### 1. Section 1981 and NYSHRL

Cadet alleges that she suffered a hostile work environment on the basis of race in violation of Section 1981 and the NYSHRL, in addition to a hostile work environment on the basis of national origin in violation of the NYSHRL. "To establish a hostile work environment . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In other words, Plaintiff must ultimately show (1) conduct that is objectively severe or pervasive, *i.e.*, conduct that a reasonable person would find hostile or abusive; (2) the plaintiff subjectively perceives the conduct to be hostile or abusive; (3) the harassment is on account of the plaintiff's protected characteristics; and (4) to the extent that the plaintiff claims harassment by coworkers,

not supervisors, a basis exists to impute the harassment to the employer.[6] *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (outlining the elements under Title VII); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 261–62 (2d Cir. 2023) ("Hostile work environment claims brought under Title VII, § 1981, and the NYSHRL are assessed using the same standard."). "[W]hen the harassment is attributable to a coworker, rather than a supervisor . . . . the employer will be held liable only for its own negligence." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998). In other words, a Plaintiff must show that a Defendant corporation had "actual or constructive knowledge" of the alleged harassment and that it failed to take reasonable and prompt remedial measures, to make out the fourth prong. *Duch v. Jakubek*, 588 F.3d 757, 761, 766–67 (2d Cir. 2009) (denying summary judgment when court could not "say, as a matter of law, that defendants' response was effectively remedial and prompt." (internal quotation marks omitted)). Defendant challenges all but the second element. (*See* Def's Mem. 11.)

With respect to the first element, "a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (emphasis in original) (quoting *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). A plaintiff can show a pervasive course of action where "a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." *Alfano v. Costello*, 294

---

[6] I note that although Defendant asserts that "all of Plaintiff's claims require analysis under the familiar burden-shifting framework established in *McDonnell Douglas*," (Mem. 5), hostile work environment claims are properly analyzed under the standard articulated in *Littlejohn* and *Brown*, not a burden-shifting framework. *See Copeland v. Rosen*, 38 F. Supp. 2d 298, 304–06 (S.D.N.Y. 1999); *see also Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *10 (E.D.N.Y. Feb. 1, 2019) ("*McDonnell Douglas* is not the proper framework to analyze hostile work environment claims") (collecting cases), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). The Second Circuit has directed courts "to consider the totality of the circumstances, and to evaluate the quantity, frequency, and severity of the incidents." *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 74 (2d Cir. 2023) (internal quotation marks omitted).

As a threshold matter, the parties dispute whether Adler's behavior and Imbachi's behavior can be considered together as one continuous course of conduct. Defendant analyzes each incident separately to see if it creates a hostile work environment, (Mem. 10–15), arguing that "a separate analysis is required for each alleged harasser as the issues are completely unrelated," (Reply 4 (emphasis omitted)). Defendant analogizes this case to *Ray v. New York State Ins. Fund*, No. 16-CV-2895, 2018 WL 3475467 (S.D.N.Y. July 18, 2018), where the court found that incidents occurring over more than five years and perpetrated by a number of different employees were not sufficiently continuous and concerted to have altered the conditions of plaintiff's working environment. *Id.* at *7–8. However, the court in *Ray* did not hold that each alleged harasser's conduct should be analyzed independently, but rather that the conduct, when considered as a whole, was not sufficiently continuous or concerted to qualify as pervasive, dooming the plaintiff's hostile work environment claim. *See id.*; *see also Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 389 (2d Cir. 2020) ("In a claim of a hostile work environment, the emphasis is on the hostility of the work environment as a whole . . . and liability is determined only by looking at all the circumstances." (internal quotation marks omitted)). Thus, I will analyze the totality of the alleged harassing conduct and determine whether it is severe or pervasive as a matter of law.

In January 2020, after Adler alleged that Cadet hit her and Cadet denied the accusation, Cadet lodged an internal complaint alleging that Adler was discriminating against her. (Pl. 56.1

¶ 11.) Plaintiff alleges that Adler made disparaging comments regarding black people, such as "[black people] don't belong here, [they] complain a lot, black people are lazy, could be lazy." (*Id.* ¶ 15; Pl. Dep. Tr. 235:12-19.) Adler said, in a November 15, 2019 statement related to the incident, that Cadet was "an evil person, an animal, and bully." (Doc. 46-9 at 2; *see also* Doc. 38-9 at 37.)

After Plaintiff returned from furlough in August 2020, she worked with Imbachi. Imbachi's conduct included intervening in an interaction between Cadet and a customer and telling the customer, "she don't know any better, she's Haitian." (Pl. 56.1 ¶ 28.) In front of Cadet on a different occasion, Imbachi threatened another black employee by saying if she didn't take a certain retirement package, he would "hang her from a tree and beat her." (*Id.* ¶ 28.) Imbachi later repeated the comment to Cadet, asking "are you going to hang me from a tree and beat me?" (*Id.* ¶ 28.) Cadet also alleges that Imbachi, on January 22, 2021, told multiple coworkers that Cadet was "not Black, [she was] Haitian." (*Id.* ¶ 29; *see also* Pl. Dep. Tr. 94:4 – 96:20; Doc 38-2.)

However, a jury crediting Plaintiff's allegations could reasonably find that Imbachi's conduct alone created an objectively hostile work environment based on Plaintiff's race and national origin. Imbachi openly disparaged Cadet's national origin to a customer, and thereafter told other coworkers that she was not Black, she was Haitian. A reasonable juror could conclude that the disparaging nature of Imbachi's initial remark about Cadet being Haitian was then amplified by Imbachi's statement that Cadet was "not Black, but Haitian" – a remark that was itself inappropriate. Imbachi also made multiple comments to Black employees, including Cadet, about hanging someone from a tree. These comments evoke the extreme, racist brutality of lynching. *See History of Lynching in America*, NAACP, https://naacp.org/find-

resources/history-explained/history-lynching-america (last visited July 9, 2026) ("Lynchings typically evoke images of Black men and women hanging from trees."). Courts have routinely relied on particularly egregious remarks with allusions to historical brutality, like the hanging from a tree comment, in finding an objectively hostile work environment. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 66, 70–71 (2d Cir. 2000) (emphasizing "physically threatening" nature of Plaintiffs' coworker's comment that he had a "rope in the back shed to hang [a Black coworker's] butt" in finding evidence of objectively hostile work environment based on race (internal quotation marks omitted)); *Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16-CV-4897, 2021 WL 1226658, at *5 (S.D.N.Y. Mar. 31, 2021) (finding that Plaintiff's coworkers' statements about throwing her back "into the fields" created a triable issue of fact as to whether there was a racially hostile work environment given possible racial connotations harkening back to slavery (internal quotation marks omitted)).

Cadet raises a triable issue of fact as to whether she experienced objectively hostile conduct sufficient to "alter[] the conditions of her working environment." *Alfano*, 294 F.3d at 374. While it is true that the Adler and Imbachi incidents did not take place in close succession,[7] Cadet need only show that her hostile working environment "was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Redd*, 678 F.3d at 175 (internal quotation marks omitted) (emphasis in original). I find that the severity of the alleged incidents and comments compensates for the relative lack of continuity, and that considered in its totality, a reasonable juror could find that the course of conduct was objectively hostile. I note, however, that due to the explicit and repeated invocation

[7] I note that the separation in time can be attributed, at least in part, to the COVID pandemic and the fact that Cadet and other Macy's employees were furloughed during some of the relevant time period. (Pl. 56.1 ¶ 2–4, 12.)

of Plaintiff's race and national origin by Imbachi, in conjunction with allusions to hanging Black employees from a tree, Imbachi's conduct alone is sufficiently severe to satisfy the first element of a hostile work environment claim. *See Whidbee*, 223 F.3d at 66, 70–71.

Next, I must consider whether there is a specific basis upon which to impute the alleged harassment to Macy's. *See Whidbee*, 223 F.3d at 72. "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (internal quotation marks omitted). "In addition, 'when a supervisor wields the authority delegated to him by an employer . . . the supervisor's conduct is deemed to be that of the employer, and the employer is liable for that conduct.'" *Williams*, 61 F.4th at 69 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 152–53 (2d Cir. 1997)).

Cadet argues that Macy's knew about Adler's harassment and did nothing about it. (Opp'n 12.) Macy's argues that it took appropriate action to separate Adler and Cadet after the incident occurred. (Mem. 12; *see also* Def. 56.1 ¶ 12.) The parties do not dispute that Cadet and Adler were separated at work at least until the conclusion of Macy's internal investigation. (*See* Pl. 56.1 ¶ 12.) Plaintiff stated in her deposition that "[a]fter [the Adler] incident, we were separated. I was working on the women's side, and she was working on the men's side and then COVID happened . . . [a]nd then she chose not to come back." (Pl. Dep. Tr. 133:8-16.) Plaintiff's own testimony underscores that Macy's took reasonable steps to address the situation. I therefore find that Adler's behavior cannot reasonably be imputed to Macy's. Because the Second Circuit has made clear that a claim against a co-worker cannot serve as a predicate for a hostile workplace environment unless "a specific basis exists for imputing the objectionable

conduct to the employer," *Alfano*, 294 F.3d at 373, I do not consider Adler's conduct independently cognizable for the purposes of Plaintiff's hostile work environment claim. Nonetheless, as I explained above, Imbachi's conduct alone is severe enough to meet the first prong of the hostile workplace environment test, *see supra* at 12–14.

With regard to Imbachi, the parties do not dispute that Plaintiff reported his conduct to Mazzamuto on March 2, 2021, which set in motion an investigation by Macy's that resulted in the termination of Imbachi's employment on March 18, 2021. (Pl. 56.1 ¶¶ 25–39.) Plaintiff argues that, despite prompt action by Macy's to terminate Imbachi, Macy's is liable for his discriminatory behavior because they were on notice of a long, documented history of discriminatory acts committed by Imbachi at work. (Opp'n 10–13.) Macy's issued a "Final Warning" to Imbachi on June 12, 2014, in part for "creat[ing] a hostile work environment" for his coworkers. (Doc. 46-4.) On March 23, 2015, Macy's issued a "Last Chance – Final Warning" to Imbachi, in part for "calling [a coworker] derogatory names in Spanish" and making "derogatory comments referencing Columbians and Dominicans." (Doc. 46-5; *see also* Doc. 38-6.) After Imbachi received the Last Chance – Final Warning, a determination which does not expire for the duration of employment under Macy's policies, (*see* Doc. 46-3 at 66:12-14), Imbachi was reported to human resources multiple times for other incidents, including telling an employee in January 2019 to "get back on the boat to Cuba, you came here illegally," (Doc. 46-6), and asking another employee in May 2019 "where is the Black girl" about a different coworker, (Doc. 46-7). Imbachi then received a Performance/Conduct Warning in December 2020. (Doc. 38-7 at 7–9.)

In *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128 (2d Cir. 2001), the Second Circuit found that Defendant Delta Air Lines could be held responsible for a hostile work environment based

on the rape of a flight attendant by a coworker because Delta was on notice of the alleged rapist's dangerousness. Prior to the plaintiff's rape, supervisory personnel had been notified that the assailant had raped two other coworkers and sexually harassed a third, and yet no steps were taken to address the behavior at issue and protect Delta's employees. *Id.* at 136. After the plaintiff reported the rape to Delta, the company undertook an investigation that led to the assailant being suspended and choosing to resign in lieu of being fired. *Id.* at 131–32. The Second Circuit found that "[i]f an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk . . . the employer does not escape responsibility to warn or protect likely future victims merely because the abusive employee has not previously abused those particular employees." *Id.* at 136; *see also Arias v. Nasdaq/Amex Mkt. Grp. d/b/a Am. Stock Exch.,* No. 00-CV-9827, 2003 WL 354978, at *8 (S.D.N.Y. Feb. 18, 2003) (hostile workplace environment claim survived summary judgment because "a jury could find that the plaintiff reasonably believed that she would lose her job if she reported further incidents [of] harassment").

Macy's handling of Imbachi's behavior presents a less extreme case than the Second Circuit addressed in *Ferris*. Unlike Delta, which took no action and indeed suppressed information about the assailant's behavior, Macy's personnel had conversations with Imbachi about his behavior and issued various warnings. Plaintiff argues that this paper trail of warnings is essentially meaningless, because despite being issued a 'Last Chance – Final Warning' in 2015, Imbachi continued to engage in harassing behavior without any real consequences for years, culminating in his behavior towards Cadet in 2021. Although a close call, I find that there is sufficient evidence of Imbachi's long history of making derogatory comments referencing race and national origin, including after he was issued a "Final Warning" and "Last Chance – Final

Warning," that a reasonable factfinder could hold Macy's liable for his harassing behavior towards Cadet.[8] Accordingly, Imbachi's conduct can be imputed to Macy's

Finally, I find that the harassment is tied to Cadet's race and national origin. With regard to the comments by Imbachi, Defendant acknowledges that Imbachi made comments to Cadet that referenced race and national origin. Defendant seeks to discount, however, comments Imbachi made in Cadet's presence but not directly to her, such as the initial "hanging from a tree" remark. Such comments must still be considered because "conduct not directly targeted at or spoken to an individual but purposefully taking place in his presence can nevertheless transform his work environment into a hostile or abusive one." *Rasmy*, 952 F.3d at 389.[9] Taken as a whole, there is a sufficient nexus between the alleged harassment by Imbachi and Cadet's race and national origin to support a hostile workplace claim.

Accordingly, Defendant's motion for summary judgment on Plaintiff's Section 1981 claim alleging a hostile work environment on the basis of race and her NYSHRL claim alleging a hostile work environment on the basis of race and national origin are DENIED to the extent they

---

[8] I also note that there is a disputed issue of fact as to whether Imbachi was a supervisor at the time he made the comments in question. However, the parties do not dispute that Imbachi's supervisory role of counter manager is "more akin to an hourly lead" than a manager, (Pl. 56.1 ¶ 22), i.e., an "hourly employee" (Doc. 37 ¶ 5), that "cannot hire, fire or discipline without partnering with human resources personnel and/or their supervisors, but can direct employes on what tasks need to be completed at the counter on a daily basis," (Doc. 39 ¶ 16). Plaintiff's allegations against Imbachi do not indicate that he "wield[ed] the authority delegated to him by an employer to further the creation of a discriminatorily abusive work environment," in which case Macy's would be liable for his conduct without regard to his history of harassment. *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21-CV-2512, 2022 WL 524551, at *6 (S.D.N.Y. Feb. 22, 2022); *see also Perry*, 115 F.3d at 152–53. Instead, Imbachi seems to be "a low-level supervisor who does not rely on his supervisory authority in carrying out the harassment," and thus Macy's is liable for his conduct only if they "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it," as with any coworker harassment. *See Perry*, 115 F.3d at 153 (internal quotation marks omitted).

[9] Defendant also argues that "[t]he Adler allegations are not tied to race in any way," describing the clash between Adler and Cadet as a "personality conflict." (Mem. 12.) I disagree. The parties agree that Adler called Cadet an "animal," a term that a reasonable juror could find has racist connotations. Furthermore, jurors could credit Plaintiff's testimony that Adler made disparaging remarks such as "[black people] don't belong here, [they] complain a lot, black people are lazy, could be lazy," (Pl 56.1 ¶ 15), to support the conclusion that the alleged harassment from Adler was connected to Cadet's race. Nonetheless, because Macy's took reasonable and prompt remedial action with regard to the Adler allegations, I do not consider this conduct for the purposes of Plaintiff's claim.

are predicated on the conduct of Imbachi. Defendant's motion is GRANTED as to Adler's conduct, because Adler's conduct cannot be imputed to the Defendant Macy's.

**2. NYCHRL**

Plaintiff also brings a hostile work environment claim for race and national origin discrimination under the NYCHRL. "A plaintiff alleging a hostile work environment has a lower burden under city law than under its federal or state counterparts." *Williams*, 61 F.4th at 69; *see also Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 346–47 (S.D.N.Y. 2017) ("In order to prevail on . . . a hostile work environment claim under the NYCHRL, a plaintiff 'need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees' because of a protected trait." (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013))).

Since Defendant has "failed to show that [it is] entitled to summary judgment under [Plaintiff's Section 1981] and NYSHRL [hostile work environment] claims, [it is] *a fortiori* not entitled to summary judgment under the more expansive NYCHRL." *Baez v. Anne Fontaine USA, Inc.*, No. 14-CV-6621, 2017 WL 57858, at *4 (S.D.N.Y. Jan. 5, 2017); *see also Accely v. Consol. Edison Co. of N.Y., Inc.*, No. 19-CV-5984, 2022 WL 973415, at *15 (S.D.N.Y. Mar. 31, 2022) (same). However, as with Plaintiff's Title VII claims, a Plaintiff's discrimination claims under NYCHRL are not viable if Plaintiff cannot show that the Defendant "bears any individual culpability for" the alleged discrimination. *Coombs-Moreno v. City of New York*, No. 22-CV-02234, 2024 WL 4287247, at *10 (E.D.N.Y. Sept. 25, 2024) (internal quotation marks omitted), *on reconsideration in part sub nom. Bryan v. City of New York*, 2025 WL 917826 (E.D.N.Y. Mar. 25, 2025), *and aff'd sub nom. Ioio v. City of New York*, 2026 WL 731089 (2d Cir. Mar. 16, 2026). Therefore, as with Plaintiff's Title VII claims, her NYCHRL claims based on Adler's

conduct cannot go forward. Defendant's motion for summary judgment on Plaintiff's NYCHRL hostile work environment claim is consequently DENIED with respect to Plaintiff's allegations based on Imbachi's conduct, but GRANTED as to any claims predicated on Adler's conduct.

**B. *Retaliation Claims***

**1. Section 1981 and NYSHRL**

Retaliation claims under both Section 1981 and the NYSHRL are governed by the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (Section 1981); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of retaliation. *See Fincher*, 604 F.3d at 720. If a plaintiff successfully establishes a prima facie case, "the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa*, 708 F.3d at 125 (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). "If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action." *Fincher*, 604 F.3d at 720 (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

"To establish a prima facie case for retaliation, a plaintiff must show that (1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001), *as amended* (Apr. 20, 2001). A retaliation claim brought under a hostile work environment theory "must satisfy the same standard that is applied generally to hostile work

environment claims regarding the severity of the alleged conduct." *Bacchus v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 214, 244 (E.D.N.Y. 2015) (internal quotation marks omitted).[10] "To establish a causal connection between the protected activity and the alleged hostility, [a plaintiff] must demonstrate 'some increase in the discrimination or harassment—either a 'ratcheting up' of the preexisting behavior, or new, additional forms of harassment.'" *Id.* at 244–45 (quoting *Hall v. N.Y.C. Dep't of Transp.*, 701 F. Supp. 2d 318, 339 (E.D.N.Y. 2010)).

There is little question that Cadet can satisfy the first two elements of her prima facie case. The parties agree that Plaintiff reported various incidents with Imbachi to her supervisor on March 2, 2021, after which Macy's opened an investigation into Imbachi and terminated him on March 18, 2021. (Pl. 56.1 ¶¶ 25–28, 39.) *See Hechavarria v. Scorch Bar & Grill Inc.*, No. 23-CV-1743, 2025 WL 2476346, at *19 (E.D.N.Y. Aug. 28, 2025) ("In addition to filing formal complaints, protected activity also includes 'informal protests of discriminatory employment practices, including making complaints to management.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))); *see also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) ("[F]or purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000))).

Cadet, however, cannot show that she suffered the necessary "ratcheting up" of her discriminatory treatment as result of her having reported the incidents with Imbachi to her supervisor.[11] After Cadet's complaint about Imbachi on March 2, 2021, Cadet alleges that her

[10] This is in spite of the fact that, in general, "anti-retaliation protection is broader [than Title VII protection] and extends beyond workplace-related or employment-related retaliatory acts and harm." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted.)

[11] I note that Cadet also alleges that she was denied a transfer to the women's fragrance department at Macy's. (*See* Pl. 56.1 ¶ 57.) I do not reach the question of whether this denial could constitute an adverse employment action

coworkers stopped referring customers to her, and they often switched from English to Spanish to talk negatively about her and call her names, including "Morena," which means "black girl" in Spanish.[12] (Pl. 56.1 ¶¶ 47–48.) Cadet claims that her supervisor, Mazzamuto, informed all of her coworkers of an instance of COVID-19 exposure, but did not tell her. (*Id.* ¶ 52.) Mazzamuto also told Plaintiff to change out of a sweater bearing the phrase "Black Girl Magic," stating that it was a dress code violation, when Plaintiff's colleagues were regularly permitted to wear shirts with graphics. (*Id.* ¶¶ 54, 56.) Cadet also utilized paid time off that Mazzamuto failed to input into the system in response to a request by text, although he eventually input her paid-time-off hours. (*Id.* ¶ 60.)

In sum, Cadet claims that her coworkers were rude to her and referred to her as the "black girl" in Spanish, her manager failed to inform her of COVID-19 exposure on one occasion, asked her to change her sweater at work on one occasion, and was unresponsive to a text on one occasion.[13] This is not enough to show that "the workplace is permeated with . . . intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

because Cadet is clear that she "brings her causes of action, both discrimination and retaliation, solely under a hostile work environment theory." (Opp'n 1.)

[12] For purposes of this analysis, I assume without deciding that Cadet's coworkers' behavior can be imputed to Macy's. "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Feingold*, 366 F.3d at 152 (internal quotation marks omitted). Although Macy's eventually investigated Cadet's claims regarding retaliatory harassment after they received a letter from Cadet's attorney, (Pl. 56.1 ¶¶ 46–46), Cadet first reported that she felt uncomfortable at work to Mazzamuto, (*id.* ¶ 42), and it appears that he did nothing about it. Neither party clarifies the date of Cadet's report to Mazzamuto, and the parties dispute whether she provided names of the coworkers who were making her feel uncomfortable. (*Id.* (citing Doc. 37 ("Mazzamuto Decl.") ¶ 16; Pl. Dep. Tr. 142).)

[13] Cadet's opposition brief references additional allegations, including that Cadet's coworkers said the word "bitch" in Spanish while Cadet walked by and that one coworker said that she looked like "something out of Star Trek" for styling her hair in a traditional African manner. (Opp'n 14; Pl. Dep. Tr. 139:2-140:4; 179:23-180:19.) These allegations are not included in Plaintiff's 56.1 statement and thus I will not consider them. *See 24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 46 (2d Cir. 2005) ("A court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements" (internal quotation marks omitted)). Even if I did consider these allegations, they would not change my conclusion that Cadet cannot show that she suffered an adverse employment action in the form of a retaliatory hostile work environment.

employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris*, 510 U.S. at 21). Some of the behavior at issue, such as switching into another language to discuss Cadet or failing to input time off when it was first requested, is inconsiderate, but it is well-established that "a pattern of simple discourtesy, without more, [is] insufficient to trigger hostile work environment protections under state or federal law." *Missick v. City of New York*, 707 F. Supp. 2d 336, 355 (E.D.N.Y. 2010). Incidents such as coworkers not referring customers to Cadet and Mazzamuto enforcing his interpretation of the dress code against her, are in line with Macy's policy, even if not the customary practice of the store, (*see* Pl. 56.1 ¶¶ 48–49, 54–56), and do not transform the workplace into an abusive environment. Although I take Cadet's allegations to be true that her coworkers referred customers to her before she reported Imbachi, this change in behavior does not demonstrate the requisite severity that is a necessary predicate for a hostile workplace environment claim. Lastly, it was certainly inappropriate for Cadet's coworkers to refer to her as the "black girl" in Spanish, but the "mere utterance of an epithet" cannot sustain a hostile work environment claim unless it is part of a greater pattern of abusive behavior. *See Harris*, 510 U.S. at 21 (alteration adopted); *see also Missick*, 707 F. Supp. 2d at 355 ("Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency."). Cadet fails to show a pattern of behavior that is sufficiently severe or pervasive to satisfy the third element of her prima facie case of retaliation.

Cadet has also failed to show that there is any causal connection between her protected activity and Mazzamuto's conduct. To the contrary, Plaintiff alleges that she had problems working with Mazzamuto prior to her reporting Imbachi, (*see* Pl. 56.1 ¶¶ 16–19), and Plaintiff does not allege that her problems with Mazzamuto escalated or their relationship changed after

she reported Imbachi, *see Bacchus*, 137 F. Supp. 3d at 244–45. In addition, Plaintiff's complaint about Imbachi was made to Mazzamuto, who reported it to Bernadette Moeller, a Senior Investigator on Macy's Colleague Advisory Team, setting in motion the investigation that resulted in Imbachi being fired within sixteen days of Plaintiff's complaint. (Pl. 56.1 ¶¶ 25–26; *see also* Doc. 38 ¶¶ 2–3.) Plaintiff does not allege that Mazzamuto tried to minimize her allegations about Imbachi, dragged his feet on reporting the allegations to Moeller, or had any other sort of negative or dismissive reaction to the Cadet's complaint, which could provide some basis to infer that his later behavior was retaliatory. As Cadet cannot show that Mazzamuto's actions were causally related to her protected activity, they must be disregarded for the purposes of Cadet's retaliatory hostile work environment claim. The lack of causal connection to Plaintiff's protected activity further demonstrates that there is not a sufficiently severe or pervasive pattern of behavior here for Plaintiff to raise a genuine dispute of material fact on the viability of her retaliation claims.

Therefore, Defendant's motion for summary judgment on Plaintiff's retaliation claims under Section 1981 and the NYSHRL is GRANTED.

**2. NYCHRL**

Cadet also brings a retaliatory hostile work environment claim under the NYCHRL. Cadet's retaliation claim under the NYCHRL must be construed "independently from and more liberally" than her claims brought under Section 1981 and the NYSHRL. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted). "Despite this lower burden for the plaintiff, the NYCHRL is not a rubber stamp for retaliation claims." *Hechavarria*, 2025 WL 2476346, at *21. "To make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity . . . ,

(2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2d Dep't 2021) (internal quotation marks omitted and alterations adopted).

Even under the more lenient standard of the NYCHRL, "petty slights or trivial inconveniences are not actionable." *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 122 (S.D.N.Y. 2020) (alteration adopted) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009)). In *Alvarado v. Nordstrom, Inc.*, the Second Circuit found that a Hispanic department store employee could not make out a hostile work environment claim on the basis of race under the NYCHRL where, among other things, coworkers followed him around the store and asked if he would prepare arroz con pollo and called him names. 685 F. App'x 4, 8 (2d Cir. 2017); *Alvarado v. Jeffrey, Inc.*, 149 F. Supp. 3d 486, 494 (S.D.N.Y. 2016). The court noted that the "comments remain merely petty even if they are hurtful." *Alvarado*, 685 F. App'x at 8. The same is true here. The allegations that Cadet's coworkers spoke about her in Spanish and called her "Morena," meaning black girl, are similar in nature to the allegations in *Alvarado*, and similarly cannot sustain a hostile work environment claim. As I stated above, *see supra* § III.B.1, the incidents with Mazzamuto cannot be considered because there is no evidence that there is a causal connection between those incidents and Cadet's protected activity. *See Bermudez v. City of New York*, No. 10-CV-1162, 2015 WL 1500235, at *12 (S.D.N.Y. Mar. 31, 2015) ("As with the NYSHRL . . . the NYCHRL requires a causal connection between an adverse act and a protected activity to prove a retaliation claim." (internal quotation marks omitted and alteration adopted)); *see also Bryant v. Merrill Lynch, Pierce, Fenner & Smith*, No.

12-CV-2940, 2013 WL 2359109, at *5 (S.D.N.Y. May 30, 2013) ("Because the federal and state retaliation claims on which summary judgment is granted fail because of the absence of retaliatory animus, they also fail under the broader NYCHRL."). However, even if I were to consider the incidents with Mazzamuto, failing to promptly input paid time off and selectively enforcing the dress code on one occasion are exactly the type of "trivial inconveniences" that the NYCHRL does not reach. *See Benzinger*, 447 F. Supp. 3d at 122 (internal quotation marks omitted). Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim under the NYCHRL is GRANTED.

## IV. Conclusion

Defendant's motion for summary judgment is hereby DENIED as to Plaintiff's Section 1981, NYSHRL, and NYCHRL hostile workplace environment claims based on Imbachi's conduct, but it is GRANTED as to Plaintiff's Section 1981, NYSHRL, and NYCHRL retaliation claims and Section 1981, NYSHRL, and NYCHRL hostile workplace environment claims based on Adler's conduct. The Clerk of Court is respectfully directed to terminate the motion pending at Doc. 34.

SO ORDERED.

Dated: July 10, 2026
New York, New York

Vernon Broderick

Vernon S. Broderick
United States District Judge